UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:16-CV-00159-HBB

WAYNE BRADLEY
And
JEANETTE LEE                                                            PLAINTIFF

VS.

D &B TRUCKS & EQUIPMENT, LLC                                            DEFENDANT

## MEMORANDUM OPINION AND ORDER

In accordance with the parties' consent, this case was reassigned to the undersigned United States Magistrate Judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73 (DN 33). This matter came before the Court for bench trial on October 23, 2018.

### Findings of Fact

This is an action for breach of contract. Defendant D&B Trucks and Equipment, LLC fabricates customized commercial Peterbilt road tractors, the motorized portion of a "tractor-trailer." It does this by combining a "glide kit," which is a road tractor lacking an engine and transmission, with a rebuilt engine and transmission of the customer's choice. D&B orders the glide kit from Peterbilt according to the customer's specifications. D&B procures separately a Caterpillar engine and Eaton transmission, both rebuilt by Caterpillar. D&B then assembles the road tractor from these components. By utilizing the glide kit approach, the customer can save taxes because the vehicle is considered a "rebuilt" vehicle. Depending on the engine selected, the customer may also avoid certain current vehicle emissions requirements.

Plaintiff Wayne Bradley owns and operates Wayne Bradley Trucking and Leasing, Inc. His business primarily hauls material on flat-bed trailers. Bradley wished to purchase a customized 2016 Peterbilt Model 389 road tractor as his "dream truck" for the remainder of his driving career. He learned of D&B through a trade magazine. Bradley already owned a 2007 Peterbilt Model 379 with which he was pleased. He wanted the new truck fabricated to essentially the same specifications, with a few changes. To that end, he provided D&B with the "building record" for the 2007 Peterbilt to use as a guide, and to which he made several notations where different options were desired. The building record is similar to the manufacturer's sticker on the window of an automobile which lists all the basic and optional features included. Jeanette Lee worked with Bradley and assisted him in communicating with D&B. The communications consisted of several faxes, photographs and e-mails, with Jeanette Lee handling most of the communications on Bradley's side and D&B's salesman Joshua Hardey serving as her point of contact. Bradley paid D&B the agreed upon purchase price. Lee is a nominal plaintiff in this action because they both guaranteed the loan for the purchase.

When D&B presented the tractor for delivery Bradley refused to take possession because he believed it failed to comport with his specifications. Most significantly, he had specified a model 6NZ Caterpillar diesel engine. He believed that the truck was equipped with a model C15 Caterpillar diesel engine. He had requested the 6NZ because it has a single turbocharger and he felt it was regarded as more reliable and lower in maintenance cost than the C15. He also rejected delivery because he did not believe the exterior lights on the cab had been placed in accordance with his specifications, nor was there a pyrometer gauge on the dashboard, which would have registered the temperature of the exhaust gas. He testified that he refused to accept delivery of the truck because he was afraid doing so would waive his complaints regarding nonconformity.

2

During the pendency of this litigation, the parties agreed that Bradley could take possession of the truck without waiving his claims.

Parsing the communications between the parties to determine the exact nature of the agreement is challenging. At trial, Bradley offered the build record for his older truck which he testified he sent to D&B as a template for the new truck's specifications. He also offered a build record for the new truck which D&B prepared and which he signed and returned to D&B evidencing his assent to the specifications. However, he also offered several other unsigned versions of D&B's build record on which he had made notes and underlining, which he testified he sent to D&B as rolling corrections to the build record he signed. Further complicating the analysis is that several of these subsequently revised build records are versions that predate the version he signed. D&B's witnesses, however, testified that the version he signed represented the building order and what he ultimately received. Another complication is that the engine was specified in separate documentation. The parties agree that there is no single writing which embodies all the terms and specifications.

Although Bradley identified what he believed were several failures by D&B to comply with his specification instructions, he only offered specific testimony on three: the lack of a pyrometer gauge, the number and placement of lights on the back of the cab, and the engine model installed. As to the pyrometer, D&B's witnesses testified that such gauges were no longer offered because they are not compatible with the centralized electronic monitoring systems currently installed on trucks. As to the lights, they testified that the lights were installed by the factory. Regarding the engine, they testified that a 6NZ is a type of C15 engine and that the engine installed is, in fact, a 6NZ model. D&B's witnesses also testified that after Bradley expressed his dissatisfaction with the truck and refused delivery, it was instructed to sell the truck. It advertised

3

the truck for sale, located a buyer, and obtained a price greater than what Bradley had paid for it. However, Bradley later instructed D&B not to sell the truck and it refunded the purchaser's price.

At trial, Bradley offered three estimates as proof of damages. The first was for installing a pyrometer gauge, the second for reconfiguring the lights on the cab and the third for the rental cost of a comparable truck. The undersigned ruled that Bradley had not laid an adequate foundation for the gauge-related estimate, as his testimony indicated he did not have the personal expertise to do the work himself and merely relied upon what the dealer had told him. The undersigned allowed introduction of the lights-related estimate, as Bradley testified that he had extensive experience working on trucks and had independent expertise to evaluate the reasonableness of the reconfiguration estimate. As to the rental estimate, he offered proof under the theory that it represented the value of the truck during the time between when he rejected delivery for non-conformance and when he eventually accepted delivery on agreement that it would not constitute a waiver of his claims.

## Conclusions of Law

To establish a breach of contract claim in Kentucky, the plaintiff must establish three things: (1) the existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract. <u>Murton v. Android Indus. – Bowling Green, LLC</u>, No. 1:13-CV-00112-GNS, 2015 U.S. Dist. LEXIS 72968, at *7 (W.D. Ky. April 14, 2015). Multiple writings may form a contract so long as one of them is signed and the other writings clearly indicate that they relate to the same transaction. <u>Snowden v. City of Wilmore</u>, 412 S.W.3d 195, 209, n. 9 (Ky. App. 2013) (*quoting* Restatement (Second) of Contracts § 132). As noted, Bradley's proof of the terms of the contract consists of a hodge-podge of marked-up writings and communications. Where the Court finds various written exchanges present ambiguous meanings, it must determine the nature

of the terms to which the parties agreed, if at all. KFC Corp. v. JRN, Inc., No. 3:11-CV- 260-H, 2012 U.S. Dist. LEXIS 6127, at *10 (W.D. Ky. Jan. 19, 2012). Moreover, any subsequent modification of a written agreement must be proven by clear and convincing evidence. Id. at *11.

As to the pyrometer, even if it was requested and specified, Bradley presented no proof of damages flowing from the breach of contract. He testified that since he took possession of the truck he has been using it without problem. While he desired the pyrometer, there was no proof that its absence has reduced the value or utility of the truck nor was there admissible evidence of cost of remediation.

Similarly, there was no clear proof that the lights were not installed as requested. The build record which Bradley signed indicated lights mounted at locations only identified as "Low Inboard Loc A," "Low Outboard Loc B," "Mid Location C" and "Bracket Mounted Outboard Loc H." Of the various marked-up versions of the build record Bradley introduced at trial, the lights are only underlined. Lee testified that the reason for underling was because of Bradley's "not knowing the locations of where A, B, and C are." (DN 47, Tr. p. 106) (*see also* Id. at p. 107). This is an insufficient basis to conclude that there was an agreement between Bradley and D&B for a light configuration other than what was shown on the build record, which D&B contends is how they are assembled at the factory.

The last nonconformity to which Bradley testified was that the engine specified in the order was a 6NZ model and instead he received a C15 model. Here there was conflicting testimony. Bradley testified that he believed he was not provided the agreed upon engine because the valve cover is marked "C15." He also believed it was not a 6NZ because it appeared to have twin turbochargers, whereas the 6NZ only has a single turbocharger. Bradley has knowledge and experience in the trucking industry working on his own vehicles for over 53 years.

5

D&B offered testimony primarily through Sales Manager Dennis Stephens, who has 10 years of experience working with glider kits and engines. He testified that the 6NZ is a specific model of the C15 engine and that the engine installed in the truck is a 6NZ model. While he was not personally involved in the fabrication of this truck, he based his opinion on three factors. First the engine serial number is 6NZ20950, which indicates that it is a 6NZ model. Moreover, a 6NZ warranty was issued on the engine. Second, he stated that photographs of the engine as installed on the truck demonstrated a "V-belt" configuration of the engine drive-belts, whereas engines with twin turbochargers utilize "serpentine" belt configurations. Finally, while the turbocharger was not visible in the photographs, he testified that the general appearance of the engine block was consistent with a single turbocharger 6NZ model. As to Bradley's contention that the engine appeared to have a twin turbocharger housing, Stephens characterized his description as consistent with a single turbocharger and not with a twin turbocharger. In weighing the conflicting testimony, the undersigned finds Stephen's certitude and factual reasons regarding the engine to be persuasive.

Moreover, while Bradley testified that he believed the 6NZ model was preferable because it was more reliable, longer-lasting and lower in maintenance cost, he offered no proof on these issues other than a general observation. Even if the engine installed was not a 6NZ model, there is no evidence of any reduction in truck value or reasonably anticipated increase in cost of operation, maintenance or longevity. "In the case of a breach of contract, the goal of compensation is not the mere restoration to a former position, as in tort, but the awarding of a sum which is the equivalent of performance of the bargain – the attempt to place the plaintiff in the position he would be in if the contract had been fulfilled." Batson v. Clark, 980 S.W.2d 556, 577 (Ky. App.

1998). Here, there was no testimony as to a measure of damages that would close any value or expense gap between a C15 and 6NZ engine, if such exists.

While these findings resolve Plaintiff's claims for breach of contract, nonetheless the undersigned will address the question of Plaintiff's claim for loss of use of the truck. Bradley had already paid the full purchase price but refused delivery because he felt the truck was not fabricated in accordance with his specifications. Following an effort at resolving the case through settlement conference, he agreed to take possession of the truck on agreement that, in so doing, he did not waive any claims in this action. Consequently, he claims the rental value of the truck for four days a week for each week between the refusal of delivery and his taking possession. Bradley testified that, notwithstanding those features which he believes are nonconforming, he has been able to utilize the truck for its intended purpose without limitation. Thus, had he taken possession of the truck at the time of delivery he could have mitigated his damages by using it to generate income while at the same time maintaining his claim for breach of contract. Bradley testified that he refused delivery because he was concerned doing so would have been an acceptance of the nonconformities. From a legal perspective, this can be considered a refusal out of concern that acceptance would constitute a waiver of the breach of contract. "Kentucky defines waiver as the 'intentional relinquishment of a known right.'" Lyles v. RDP Co., 702 Fed. Appx. 385, 398 (6th Cir. 2017) (*quoting* Bates v. Grain Dealers Nat'l Mut. Fire Ins. Co., 283 S.W.2d 3, 5 (Ky. 1955)). At trial there was clear testimony that he placed D&B on notice of his dissatisfaction at the time it was tendered for delivery. D&B offered no testimony that it was prepared to allow Bradley to take delivery without waiver of any claim for breach of contract and, as such, Bradley's concern was legally justified.

The same cannot be said for Bradley's refusal to allow D&B to sell the truck to a third party. "It is well established that a party claiming damages for a breach of contract is obligated to use reasonable efforts to mitigate its damages occasioned by the other party's breach." Deskins v. Estep, 314 S.W.3d 300, 305 (Ky. App. 2010). The party committing the breach bears the burden of proving that the plaintiff failed to mitigate his damages. Jones v. Marquis Terminal, Inc., 454 S.W.3d 849, 852 (Ky. App. 2014). One cannot "stand idly by and permit the loss to accrue or increase, then hold him who breached it liable for the loss which he might have prevented by the use of reasonable efforts, expense, and diligence to prevent, or arrest, the loss." United States Bond & Mortg. Corp. v. Berry, 61 S.W.2d 293, 298 (Ky. 1933). Reasonableness of mitigation is a question of fact to be determined in the context of the specific case. Am. Towers LLC v. BPI, Inc., 130 F. Supp. 3d 1024, 1036 (E.D. Ky. 2015).

The testimony in the case was that D&B had arranged the sale of the truck to a third party which would have both fully refunded Bradley's purchase price and apparently netted him some degree of profit. Bradley's testimony as to why he refused the transaction was inconsistent. He testified he was concerned that D&B would keep the money, which is illogical since D&B had already been paid for the truck. He also testified he was concerned that the bank would keep the money and he would "just get the drippings." However, as the purchase was financed by the bank, it makes sense that the bank would receive the proceeds as payoff of the loan. If the proceeds exceeded the payoff, the bank would have no right to keep the difference. His testimony on cross examination that he refused the sale of the truck because he wanted to keep it for "litigation purposes" strikes the undersigned as the most likely motivating purpose. D&B demonstrated that the truck could be sold for an amount more than Bradley paid for it, thereby making him whole on any breach, but he refused to allow mitigation of his damages.

Turning next to D&B's counterclaim, D&B asserted a claim for storage fees beginning September 1, 2016, having notified Bradley on August 17, 2016 that it would begin charging a fee of $25.00 a day pursuant to KRS 376.270 (DN 7).  In its pretrial brief, D&B indicated that the claim for storage fees had an end date of December 8, 2017, when Bradley took possession of the truck following the settlement conference (DN 43).  At trial, however, D&B offered no testimony or evidence on the issue of its counterclaim.  As such, there is no basis upon which to make any award to D&B on its counterclaim.

ORDER

**IT IS HEREBY ORDERED** that on the claim by Plaintiffs Wayne Bradley and Jeanette Lee against Defendant D&B Trucks and Equipment, LLC judgment is awarded in favor of Defendant.

**IT IS FURTHER ORDERED** that on Defendants counterclaim, judgment is awarded in favor of the Plaintiffs.

This is a final and appealable Order and there is no just cause for delay.


Copies:	Counsel